SCHLUMBERGER WELL SERVICES, A DIVISION OF SCHLUMBERGER TECHNOLOGY CORPORATION, Plaintiff,

v.

Jerry A. BLAKER, BPB Instruments, Inc., A Division of BPB Instruments, Defendants.

No. EV 84–262–C.

United States District Court,
S.D. Indiana,
Evansville Division.

Jan. 23, 1985.

Brian P. Williams, Kahn, Dees Donovan & Kahn, Evansville, Ind., for plaintiff.

Fred S. White, Bamberger, Foreman, Oswald and Hahn, Daniel Hewins, Hewins & Hewins, Evansville, Ind., for defendants.

## MEMORANDUM ORDER

BROOKS, District Judge.

This matter came before the Court on October 5, 1984 on the plaintiff's, Schlumberger Well Services (hereinafter Schlumberger), complaint for injunctive and declaratory relief against the defendants, Jerry G. Blaker (hereinafter Blaker) and BPB Instruments, Inc. (hereinafter BPB). Schlumberger in its claim for relief against the defendants seeks to enforce certain provisions of an employment agreement entered into by Blaker on October 15, 1969 and to restrain BPB from employing Blaker for a period of two (2) years from March 1, 1984. Jurisdiction of this court is predicated upon diversity of citizenship, 28 U.S.C. § 1332(a).

On October 11, 1984 the Court conducted a hearing on Schlumberger's request for a temporary restraining order. After considering the arguments presented, the Court found that the potential hardship to Blaker if the restraining order was granted outweighed the threatened harm to Schlumberger from Blaker's continued employ-

ment by BPB and accordingly denied Schlumberger's request for a temporary restraining order. Thereafter, on October 25, 26 and November 8, 1984 the Court heard evidence and argument on Schlumberger's motion for preliminary and permanent injunctive relief. At the conclusion of the hearing the parties indicated that they wished to submit post-hearing briefs, which have now been submitted, and the Court now deems the matter ripe for ruling. This memorandum constitutes this Court's findings of fact and conclusions of law for purposes of Federal Rules of Civil Procedure 52(a).

Plaintiff, Schlumberger, is a Texas corporation with its principal office in Houston, Texas. In addition to its Houston operation Schlumberger has numerous division and district offices as well as operating facilities all over the North American Continent. One of the principal areas of Schlumberger's business is in well services including the wireline logging of oil and gas wells. As one of Schlumberger's witnesses indicated at the hearing, Schlumberger endeavors to offer its services wherever a well is drilled. BPB is an English owned company who previously had been primarily involved in the evaluation of coal reserves but who has gradually expanded into the oil and gas wireline logging business. Presently BPB offers its logging services in the Illinois Basin area, Canada, and through a wholly owned subsidiary, in West Virginia. With respect to the wireline logging business Schlumberger and BPB are competitors in certain limited geographical areas although, at least in the Illinois Basin area, neither company has a major share of the business.

Blaker has been employed since August 1, 1984 as Executive Vice President of BPB's operations in the United States and Canada. As such, his responsibilities include the organization, management, and marketing of BPB's wireline logging operations. He has no responsibilities with regard to BPB's subsidiary in West Virginia, Allegheny Nuclear. Prior to being employed by BPB, Blaker was employed by Schlumberger. As a condition of his employment with Schlumberger, Blaker was required to execute an Employment Contract, dated October 15, 1969, the provisions of which Schlumberger now seeks to enforce. During his approximately fifteen (15) year employment with Schlumberger, Blaker was promoted from his initial position as a Junior Field Engineer, and held, among other jobs, positions as a Senior Field Engineer, Log Analyst, Sales Engineer, District Manager, Marketing Manager, Marketing Development Engineer, and Division Manager. His last position prior to being terminated by Schlumberger was as a Division Manager for the Rocky Mountain Division in Denver, Colorado. As a Division Manager, Blaker was responsible for overseeing Schlumberger's wireline logging business in Colorado, New Mexico, Wyoming, Utah, Montana, and North and South Dakota.

On February 27, 1984 Blaker was advised that his employment with Schlumberger was being terminated and he was presented with a termination agreement and release to review and sign, which he did the same day. The agreement, while making reference to the 1969 Employment Contract with respect to Blaker's continuing obligations, also provided for certain cash payments to be made to Blaker over a period of two (2) years as consideration for Blaker's agreement to release Schlumberger from any and all claims which he might have against Schlumberger including claims arising under the Civil Rights Act, the Age Discrimination Act, or any other state or federal statute or regulation, and for his acknowledgement and acceptance of the payments as full compensation for any injury or damage suffered by him as a result of his employment with Schlumberger. Thereafter, Blaker began to seek other employment, and was subsequently hired by BPB.

Schlumberger then instituted this action seeking enforcement of the restrictive covenant contained in the 1969 employment agreement and enjoining Blaker's continued employment with BPB for a period of two (2) years commencing March 1, 1984.

The pertinent provisions of the employment contract on which Schlumberger relies provide as follows:

... Employee agrees that for a period of two (2) years following the date of termination of his employment with Company, he will not directly or indirectly engage in, assist, advise, carry on or be interested in, either on his own account or as a principal or agent, partner or shareholder, director, officer or employer of or consultant with any other person, firm or corporation, or otherwise, with respect to any activities which are similar to or in competition with those of Company:

(a) in a zone of 100 mile radius from the Company location or office where employee worked on the date of such termination, or

(b) in any other zone of 100 mile radius from a location or office where Company or its affiliates shall have, in the year preceding the date of such termination, done or is then doing such business.

It is Schlumberger's position that Blaker reaffirmed the above restrictive covenant in return for valuable consideration when he executed the termination and release agreement in February, 1984; that during his employment with Schlumberger, Blaker was exposed to trade secrets, and other confidential and proprietary information which Schlumberger wishes to protect and which will inevitably be disclosed to BPB as a result of Blaker's employment, and that such disclosure will result in irreparable harm to Schlumberger; and that the only practicable method of insuring against the use or disclosure of Schlumberger's trade secrets or proprietary information is through enforcement of the restrictive covenant.

Blaker and BPB have raised several defenses to the enforcement of the restrictive covenant in this case. First, they argue that the covenant is unduly restrictive in that it seeks to prevent Blaker from working in too large a geographical area. Second, it is contended that the employment agreement provided a procedure for waiver of enforcement of the restrictive covenant and that Schlumberger's refusal to consent to such waiver was unreasonably withheld. Finally, defendants put forth the argument that Schlumberger should be estopped from enforcing the restrictive covenant by reason of its failure to enforce such provisions against others who were similarly situated to Blaker and because of oral representations made by Schlumberger management personnel that there should be no problem in obtaining a waiver.

It is axiomatic that in order for a party to obtain a preliminary injunction certain threshold requirements must be met. *General Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588 (7th Cir. 1984); *Roland Machinery Company v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir., 1984); *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir.1976). And while there has been disarray in this and other circuits as to the proper standards *Roland Machinery, supra*, best articulates the factors the Court must consider in deciding whether to grant or deny a motion for a preliminary injunction. Those factors are:

(1) In every case in which plaintiff wants a preliminary injunction he must show that he has "no adequate remedy at law" and that he will suffer "irreparable harm" if the preliminary injunction is not granted.

(2) In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, it does not mean wholly ineffectual, but rather seriously deficient as a remedy for the harm suffered.

(3) The Court must also consider any irreparable harm that the defendant might suffer from the injunction.

(4) Plaintiff must also show some likelihood of success on the merits. It is enough that the plaintiff's chances are better than negligible.

(5) If plaintiff shows some likelihood of success, the court must then determine how likely that success is because that affects the balance of rela-

tive harms. The more likely the plaintiff is to win, the less heavily need the balance of harms weight in his favor; the less likely he is to win, the more need it weigh in his favor.

(6) The Court sometimes must consider whether the grant or denial of a preliminary injunction will have consequences beyond the immediate parties; i.e. the public interest.

With these factors in mind, the Court must now turn to the merits of the case and the question of the restrictive covenant.

The initial inquiry with respect to the restrictive covenant is the choice of law to govern the action. Since it is clear that a federal court must apply the substantive law of the state in which it sits, this Court is bound to look to the law of Indiana to resolve this dispute. *Erie Railroad v. Tompkins,* 304 U.S. 64, 68, 58 S.Ct. 817, 818, 82 L.Ed. 1188 (1938). *Coldwell Banker & Co. v. Karlock,* 686 F.2d 596 (7th Cir.1982), Indiana courts have, on numerous occasions, addressed the enforceability of restrictive covenants such as the one involved herein. *Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556 (Ind.1983); *Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 127 N.E.2d 235 (1955); *Slisz v. Munzenreider Corp.,* 411 N.E.2d 700 (Ind.App. 1980); *Captain & Co., Inc. v. Towne,* 404 N.E.2d 1159 (Ind.App.1980); *Frederick v. Professional Building Maintenance Industries, Inc.,* 168 Ind.App. 647, 344 N.E.2d 199 (1976). From these cases certain general principles may be distilled.

First, although restrictive employment covenants in restraint of trade are not favored by the law they nevertheless will be enforced where reasonable. *Licocci, supra.* Second, a covenant will be deemed reasonable where; (1) the restraint is reasonably necessary to protect the employer's business, (2) it is not unreasonably restrictive of the employee, and (3) enforcement is not antagonistic to the public interest. *Donahue, supra.* Third, reasonableness is partially determined by a consideration of duration, geographic area and the interest sought to be protected. *4408, Inc.*

*v. Losure,* 175 Ind.App. 658, 373 N.E.2d 899, 901 (1978). Fourth, covenants which restrict the competitive employment of an employee beyond the area of his employment are void unless such subsequent employment includes the use or divulgence of trade secrets. *Donahue, supra.* And finally, questions involving the enforcability of restrictive covenants may only be resolved by examining the facts and circumstances peculiar to each case. *Slisz, supra.*

Neither Blaker nor BPB have questioned whether the restrictive covenant at issue herein is necessary to protect Schlumberger's business, or whether it is reasonably limited in duration. The focus of defendants' attack on the covenant is on its geographical coverage. Blaker argues that enforcement of the covenant will, as a practical matter, prevent him from pursuing the profession in which he has fifteen (15) years experience everywhere on the North American Continent and possibly everywhere in the world for a period of two years. The Court is of the opinion that there is some merit to this argument. At the hearing on the preliminary injunction, Blaker introduced an exhibit which reflected the predominent oil and gas fields in the United States and a portion of Canada (Blaker Ex. 9). Through the use of transparent overlays, Blaker was able to establish the location of Schlumberger offices as well as the areas affected by application of the one hundred mile radius provision of the restrictive covenant. Examination of this exhibit reveals that if the restrictive covenant is enforced Blaker will be prohibited from engaging in any business similar to Schlumberger's in substantially every oil and gas producing area in at least the United States and Canada for a period of two years.

Schlumberger has attempted to counter this argument in two ways. They first point out that Blaker received valuable consideration in the form of periodic payments in the sum of Ninety Eight Thousand Seven Hundred Fifty Dollars ($98,750.00) in return for his reaffirmance of the covenant

not to compete in February 1984 and that such sum is sufficient consideration for the covenant including the territorial limitations. Secondly, it is contended that Blaker was exposed to vast amounts of confidential or proprietary information and trade secrets which would be of substantial benefit to BPB in its effort to establish itself in the wireline logging business. Because of the similarity of Blaker's past and present positions, it is argued that it is inevitable that disclosure of this information will be made, and since the confidential information and secrets are not susceptible of limitation to specified geographical locations, it is necessary to enjoin Blaker from using this information in *any* area in which Schlumberger is doing business.

With respect to Schlumberger's first argument, it is, in the opinion of the Court, difficult to find that Schlumberger's payment arrangement provides justification for the broad scope of the geographical limitations contained in the covenant. The evidence introduced at the hearing revealed that Blaker, based upon his tenure at Schlumberger, was entitled to six (6) months notice of termination with accompanying payment, at full salary. Concededly, the requisite period of notice was not given; however, the February, 1984 termination and release agreement did make provisions for payment of six (6) monthly payments of Six Thousand Five Hundred Eighty Three Dollars and Thirty Three Cents ($6,583.33) commencing on April 1, 1984, which payments were coincidentally equal to Blaker's monthly salary. Other provisions of the agreement provided for eighteen (18) equal monthly payments of Three Thousand Two Hundred Ninety One Dollars and Sixty Seven Cents ($3,291.67) commencing October 1, 1984. In return for the above stated consideration Blaker was required to accept the following obligations:

First, you are releasing and discharging Schlumberger from any and all claims, demands, and causes of action that have accrued in your favor through the date of or as a result of termination of your employment with Schlumberger and of your acceptance of this letter. This release includes, but is not limited to, claims arising under the Civil Rights Act, the Age Discrimination Act, any claim for breach of contract (express or implied), and any claim under any other state or federal statute or regulation. Second, your acceptance of this letter will serve as your acknowledgment of the receipt of and the acceptance of the consideration described in the first paragraph in complete and final settlement as full compensation for any alleged injuries or damages of whatever nature suffered by you in connection with your employment with and termination by Schlumberger. You understand and agree that this release will be considered to be and shall be a complete bar to any action which might be brought by you in connection with such employment with Schlumberger and the termination thereof.

Third, any breach by you of any term or condition of this letter or any contract that you may have with Schlumberger will release Schlumberger from any further liability to make the payments I referred to in the first full paragraph of this letter, but will not otherwise release you from your obligations under this letter. In addition, this release will not constitute a bar to any further remedies, legal or equitable, which may arise in favor of Schlumberger as a result of any such breach.

■ Although Schlumberger asserts that the above agreement recites the payment of consideration in return for Blaker's covenant not to compete, the Court feels compelled to reach a contrary conclusion. The six monthly payments in the Court's view, provided Blaker with nothing more than what he would have apparently been entitled to under the terms of the 1969 Employment Agreement, *i.e.* six (6) months notice with accompanying salary. Any additional sums, to be paid as consideration would appear to be consideration in return for Blaker's forebearance from asserting any rights that he may have had including his right to six months notice of

termination. Thus, in the Court's view while portions of the sums to be paid might arguably be related to the covenant not to compete, it would appear from reviewing the document as a whole, and the conditions under which it was executed that its main focus was to secure a waiver of Blaker's notice of termination rights, as well as any other rights which he might have been able to assert. Accordingly, the Court does not find that the Ninety Eight Thousand Seven Hundred Fifty Dollars ($98,-750.00) referred to in the termination and release agreement was substantial consideration for Blaker's compliance with the covenant not to compete.

Schlumberger has also contended that the geographic limitations contained in the restrictive covenant are necessary because of Blaker's exposure to what Schlumberger perceives to be voluminous confidential/proprietary information and trade secrets. In the view of the Court this argument, while having some merit, is certainly overstated. Testimony of Schlumberger witnesses established that during the course of Blaker's employment he was exposed, as might be expected, to various research and development plans, marketing and sales data, and test results on new tools, among other things. Most, if not all, of this information was necessary for Blaker to perform his various jobs with Schlumberger in a satisfactory manner. However, by no stretch of the imagination can it be said, as some of Schlumberger's operations including training methods, salaries, and the number of Schlumberger trucks on the road is confidential/proprietary information or trade secrets which warrant the sort of protection which Schlumberger now seeks.

It is true that courts in Indiana and elsewhere have recognized that where trade secrets are involved restrictive covenants may be enforced throughout the affected area of the business of the employer. See, *Lawter International, Inc. v. Carroll*, 116 Ill.App.3rd 717, 72 Ill.Dec. 15, 451 N.E.2d 1338 (Ct.App.1983); *Wells v. Wells*, 9 Mass.App. 321, 400 N.E.2d 1317 (1980); *Donahue v. Permacel, supra.*

However, in each of the cases relied upon by plaintiff in support of its argument that this Court may enjoin Blaker and BPB, the courts examined the nature of the confidential/proprietary information or trade secrets involved, before determining whether to enforce the non-compete agreement. See, *FMC Corporation v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61 (2nd Cir.1984); *Union Carbide Corporation v. UGI Corporation*, 731 F.2d 1186 (5th Cir. 1984); *Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114 (1982); *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 137 U.S.P.Q. 804, 192 N.E.2d 99 (Ct.App.1963). Thus, this Court feels compelled to examine the nature of the information which Schlumberger now seeks to protect.

Schlumberger first seeks to prevent Blaker from using any interpretative or marketing skills which he had acquired as a Schlumberger employee. It is undisputed that during the course of his employment with Schlumberger that Blaker developed a certain amount of expertise in computer and interpretation skills and dipmeter technology. Several witnesses referred to Blaker as an expert in these areas. However, there was no evidence presented that the development of these skills is unique to Schlumberger or facilitated solely by them. To the contrary, the evidence discloses that there are several methods used for problem solving which require computer and interpretative skills and it is clear that the use and development of dipmeters, as opposed to the design of any particular company's dipmeter, is well known throughout the industry. Thus, while Schlumberger undoubtably feels that they are the leaders in the industry and are responsible for the development of Blaker's expertise in these areas, the Court is not of the opinion that Blaker may be enjoined from using these skills. As has been noted, "[t]he mere fact that an employee has acquired skill and efficiency in the performance of the work as a result of his employment does not suffice to warrant the enforcement of a covenant on his part not to compete." 17

C.J.S. Contracts § 254 at 1141 (1963); *See also, Slisz v. Munzenreider, supra.*

In addition to seeking to enjoin Blaker from using the skills that he has developed, Schlumberger has also sought to enjoin Blaker from using or disclosing what Schlumberger contends is confidential/proprietary information or trade secrets. Essentially, Schlumberger seeks protection from disclosure in two (2) broad categories: (1) Pricing information including profitability, and (2) research and development information. Each of these will be examined in turn.

Schlumberger introduced several documents and their witnesses testified at some length regarding Blaker's exposure to confidential pricing information. And while it is conceded that the price lists for its various logging services is in the public domain, Schlumberger nevertheless contends that senior managers, like Blaker, were exposed through various reports to highly confidential profit information. While the Court would agree that Schlumberger's profitability on various services is confidential/proprietary information, it is not persuaded that that fact alone provides sufficient justification for the scope of the geographical limitations contained in the restrictive covenant included herein.

■ The evidence supports Schlumberger's assertion that Blaker was privy to confidential profit information for the Rocky Mountain Division of Schlumberger's operations, and Blaker does not seek to refute that. However, there was nothing presented which would show that Blaker was exposed to any profit information for other areas of Schlumberger's operations. The most that can be said is that Blaker, as a Division Manager, would have had access to profit information for other areas had he requested such information. There is no indications that he did so. In addition, it was brought out that discounting of services has occurred in all divisions of plaintiff's operations since late 1982 or early 1983. Thus, while Blaker has some general knowledge that one service is more profitable than another, he certainly would

be unable to determine the revenue and profit generated from each service in each division, unless he also knew the extent of the price discounting in each area and the overhead involved in logging each job. Examination of Schlumberger's monthly Market Performance Summary, Uniform Operating Statistics, and Field Profit Summary (Schlumberger Ex's. L and M; Ex. A to Affidavit of R.M. "Bud" Bell) reveals that Division Managers received numerous reports reflecting Schlumberger's market share, dollar volume of sales, revenue per job, as well as break downs of various field expenses. While all of this information is no doubt of great benefit to Division Managers in their respective divisions at the time it is received, the Court fails to comprehend how disclosure of such information justifies a geographical restraint that encompasses, for all practical purpose, the entire North American Continent.

In the case *sub judice,* Blaker is not working for a competitor in the same geographical area in which he was employed as a Division Manager. Nor is there any evidence that BPB intends to expand their wireline logging operations into the area covered by Schlumberger's Rocky Mountain Division. Even if they should expand into the Rocky Mountain area, it is highly unlikely that the specifics of Schlumberger's profit margins in 1983 and early 1984 would be of benefit to BPB due to the volatile nature of the pricing schedules. Thus, while the Court would agree that Schlumberger's profit margins and costs are confidential or proprietary in nature, the Court nevertheless does not believe it is necessary, in order to prevent disclosure, to enforce the restrictive covenant throughout the geographical area contemplated by the agreement.

Schlumberger also introduced numerous exhibits to show the extent to which Blaker was exposed to trade secrets which Schlumberger wishes to protect. It is argued that the geographical limitations contained in the covenant not to compete are necessary for the protection of these trade secrets, since the information encompassed

therein is susceptible of use where any wireline logging is conducted. Indiana has recently enacted the Uniform Trade Secrets Act, Ind. Code § 24–2–3–1 *et seq.* That Act defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, devise, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain exonomic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Court has carefully examined both the exhibits introduced and the testimony presented at the hearing which Schlumberger contends establishes the existence of and Blaker's knowledge of Schlumberger trade secrets. And, while some of the information clearly falls within the above definition of a trade secret (*i.e.* the Volan program) other data which Schlumberger seeks to protect does not fit quite so neatly into any of the above described categories which qualify for treatment as trade secrets.

Clearly, the Houston Engineering-Three Year Plan, the NAM Operations Market Research and Product Development Quarterly Report, the SWS-Engineering, Houston Monthly Reports and the Research and Development Three Year Plan contain matters of a technological nature which are intended to be confidential. Each contains information regarding the development of new tools, the on-going technological improvements to existing tools, and the positive and negative aspects of various field tests. In addition, there is little doubt that the above materials also contain substantial amounts of material which the Court would characterize as commercial in nature; *i.e.* projected spending on various projects, time tables for introduction and field testing of new devices, and plans for future market opportunities. While the above is certainly not an exhaustive list of the information which Schlumberger wished to protect, it is, based upon the Courts examination, information which is sufficiently descriptive and detailed in nature so as to persuade the Court that it should be regarded as trade secrets which are entitled to protection.

Schlumberger and BPB are competitors in the wireline logging business and while it is beyond question that BPB, at this time, has only a small share of the wireline logging market it would be unrealistic to believe that BPB would not benefit from disclosure of the above information should they choose to use it. This is not to say that BPB has or intends to use, or even has knowledge of the information which this Court has found should be regarded as trade secrets. It is the possibility that it could be used, if disclosed, which is of concern. Schlumberger has expended substantial time, effort, and sums in research and development and the collection of data with regard to the wireline logging industry. They have sought, in various ways, to maintain the confidentiality of both this information and their appreciation of the technical problems associated with all phases of the business. Based upon its examination and the testimony presented, this Court deems it inequitable to sanction the disclosure of such information.

It has been argued that there has been no showing that the information which Schlumberger wishes to protect has in fact been disclosed. That is true. No allegations have been made that Blaker has advised BPB regarding any trade secrets, nor that BPB has sought such information. However, the Court is inclined to agree that disclosure of at least some of the information sought to be protected is inevitable. See, *Air Products, supra; Emery Industries, Inc. v. Cottier,* 202 U.S.P.Q. 829 (S.D.Oh. Aug. 18, 1978). Because of the difficulty in ascertaining the nature and extent of any benefit to BPB from disclosure, the injury, if any, to Schlumberger's market position, or the amount of damages which might be attributable to

any such disclosure, it would appear, based upon the evidence presented thus far, that Schlumberger would have no adequate remedy at law and may suffer irreparable harm if a preliminary injunction is not issued. In addition, it appears to this Court, that Schlumberger has shown the possibility of some likelihood of success on the merits. However, this Court must also balance the above factors with the potential harm to the defendant if the injunction is granted.

BPB, no doubt, can find another qualified person to fill Blaker's position. To do so obviously will cause some disruption to their plans for establishing themselves in the wireline logging business, but the Court does not believe that such a problem is insurmountable or will irreparably harm BPB. The situation with regard to Blaker, however, is significantly different. Blaker, after his termination, made substantial efforts to locate other employment both in and out of the industry in which he had experience. He was required to relocate his family and has in fact done so. Enjoining Blaker from employment in an area where most, if not all, of his background and training would be relevant, would in the opinion of this Court, be potentially devastating to both Blaker and his family.

The Court has given consideration to other factors as well. Blaker was not employed by Schlumberger, in a strict sense, as an engineer with responsibility for the design and manufacture of tools or devices used in the wireline logging industry. His background is not in engineering. Thus, even though he has had exposure to technological data and reports there is no indication that Blaker could, based upon any retained knowledge of Schlumberger trade secrets, reverse engineer any tool or device or provide sufficient technological data for others to do so. Blaker's main functions with BPB are to be the marketing, organization, instruction and staffing of BPB's wireline operations. This necessarily will involve Blaker in many activities which are similar to those which he performed as a Division Manager with Schlumberger; however, it is not clear that such activities

will require him to use or disclose what this Court has determined to be trade secrets of Schlumberger, and in fact it would appear that much of the information which is used to evaluate market opportunities, competitors activities, etc., is in the public domain in the form of the Petroleum Review (BPB Ex. 4); P.I. Log Alert (Schlumberger Exs. 0–1 through 4); and Scout Check (Blaker Ex. 3).

Having given consideration to all of the above, and having attempted to balance the relative harm to each of the parties the Court concludes that Schlumberger's motion for a preliminary injunction should be DENIED in part and GRANTED in part. In so far as Schlumberger seeks to enjoin both Blaker, from working for BPB, and BPB from employing Blaker for a period of two (2) years commencing March 1, 1984, the motion is DENIED. The Court however does feel compelled to ENJOIN the use or disclosure by Blaker or BPB of the following for a period of two (2) years commencing March 1, 1984:

(1) Any strategic, long range and annual business plans of Schlumberger

(2) Any information with respect to near term planning.

(3) Any information contained in the Houston-Three Year Plan, the NAM Operations Market Research and Product Development Quarterly Report, the SWS Engineering-Houston Monthly Reports, or the Schlumberger-Doll Research and Development Three-Year Plan.

(4) Any information relating to the Volan volumetric analysis program, including the theory underlying such program and the formulas by which such program is developed.

(5) Any information regarding the development or technological improvements to any of Schlumberger's logging tests, including but not limited to the dipmeter tool, and the RFT logging tool.

(6) Any information developed as a result of Schlumbergers field testing of

tools, including, but not limited to, the bore-hole seismics and digital sonic tools.

(7) Any information on the development or testing of satellite communications presently being developed by Schlumberger.

In addition, the Court further finds that Blaker and BPB should be ENJOINED from any of the following:

(1) From employment in the research and development department of BPB, including employment as a consultant or advisor.

(2) From employment in the design or development of interpretative computer programs or processes.

(3) From employment in the development of bore hole or digital sonic tools, RFT technology or satellite technology.

IT IS SO ORDERED.